CLERK OF SUPREME COURT     JUN 21, 2017     ELECTRONICALLY FILED

**IN THE COURT OF APPEALS OF IOWA**

No. 16-1419
Filed June 21, 2017

**IN RE THE MARRIAGE OF JODI LYNN ERPELDING
AND TIMOTHY JOHN ERPELDING**

**Upon the Petition of
JODI LYNN ERPELDING,**
        Petitioner-Appellant/Cross-Appellee,

**And Concerning
TIMOTHY JOHN ERPELDING,**
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Kossuth County, Patrick M. Carr,

Judge.


        Jodi Erpelding appeals the economic provisions of the decree dissolving

her marriage to Tim Erpelding, and Tim cross-appeals the children's split

physical care. **AFFIRMED AS MODIFIED AND REMANDED.**


        Thomas W. Lipps of Peterson & Lipps Law Firm, Algona, for appellant.

        Matthew G. Sease and Christopher R. Kemp of Kemp & Sease, Des

Moines, for appellee.


        Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Jodi Erpelding appeals the economic provisions of the decree dissolving her marriage to Tim Erpelding, and Tim cross-appeals the physical-care arrangement and his child-support obligation. After our de novo review, we find the district court's provision for split care of the two brothers promotes the best interests of each child. Due to a scrivener's error, we remand for the district court to recalculate Tim's child support. We reject Jodi's claim she is entitled to reimbursement alimony but modify the decree to increase Jodi's traditional alimony from $1166 to $1666 per month. Resolving an issue of first impression, we conclude the prenuptial agreement's prohibition on the district court's award of attorney fees as to issues of parental responsibility and child support violates Iowa public policy. We remand for the district court to determine and assess the appropriate amount of Jodi's attorney fees for the trial and on appeal.

## I.    Facts and Prior Proceedings

Tim and Jodi lived together for five years on the Erpelding family farm before executing a prenuptial agreement in November 1997. Jodi discussed the agreement with her own attorney before signing it. At that time, Tim—a lifelong farmer—listed his net worth at more than $500,000, while Jodi had a net worth of $41,000. The parties married in December 1997.

Tim farmed with his father in Kossuth County, east of Algona. Tim's father died a few years before the parties' dissolution, and Tim received both gifts and an inheritance from his father. Tim continued to operate the family farm with his brothers, who had other full-time employment and farmed only part time. Jodi,

also from Kossuth County, works for the Iowa State Education Association (ISEA).

The parties have two sons, W.E., who was born in 2001, and D.E., who was born in 2005. During the marriage, Jodi's work location changed from nearby Algona to Emmetsburg, and finally, to Clear Lake, which is about forty miles from the family farm. Jodi reduced her hours after W.E.'s birth and again after D.E.'s birth, generally working four days a week. Jodi's employer also provides her with another day off each week in June and July.

Jodi suffered a heart attack in September 2014, which she attributed to the stress of an unhappy marriage. When she and Tim separated in January 2015, Tim moved in with a sibling who lived nearby. Tim and his attorney aided Jodi's negotiations for a house in Clear Lake, closer to her office, as the transaction occurred before Jodi had obtained counsel. Using a bank loan, Tim financed the Clear Lake home for Jodi. In February 2015, Jodi filed a petition to dissolve the marriage.

In the decree dissolving their marriage of eighteen years, the district court awarded Jodi and Tim joint legal custody and split the physical care of the parties' two sons. On the financial side, the district court found the parties' prenuptial agreement was "clear and unambiguous" in requiring all property each party owned before the marriage, as well as all property each party acquired during the marriage in his or her individual name, to be awarded "to the party in whose name it is registered or who otherwise owns the same" in the event of a dissolution. Based on the parties' agreement, the court awarded Jodi assets worth approximately $810,000 and no debt. Similarly, Tim received his assets,

including inherited and gifted assets and a debt obligation of $944,454, for $6,300,000 in net assets.[1] The court rejected Jodi's request for reimbursement alimony but awarded her traditional alimony in the amount of $1166 per month.

Jodi appeals, and Tim cross-appeals.

## II. Scope and Standard of Review

In this equitable proceeding, we review de novo. *See In re Marriage of Probasco*, 676 N.W.2d 179, 183 (Iowa 2004). "[W]hen considering the credibility of witnesses, we give weight to the district court's findings of fact, but we are not bound by them." *Id.* "No hard and fast rules govern the economic provisions in a dissolution action; each decision turns on its own uniquely relevant facts." *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998). Generally, we will disturb the trial court's ruling only when there has been a failure to do equity. *Id.*

## III. Split Physical Care

During the parties' initial separation in the spring and summer of 2015, they shared physical care while W.E. and D.E. finished the second semester of third grade and eighth grade, respectively, at Bishop Garrigan, Algona's parochial schools. But neither party requested shared care at trial. In the summer of 2015, Jodi sought temporary physical care of both boys, and the parties agreed to mediate the issue with former justice David Baker. In August 2015, the parties agreed to a pre-decree plan for the upcoming 2015-16 school year—D.E. lived in Clear Lake with Jodi and attended the local public school for

---

[1] The court assigned Tim his farm-related debt of $635,454 and the $309,000 debt Tim had assumed when he took out a loan for Jodi's new home.

fourth grade, and W.E. lived with Tim on the farm and attended ninth grade at Garrigan high school in Algona.

Before trial, Tim asked the court to appoint a guardian ad litem (GAL), suggesting attorney Gregory H. Stoebe. Jodi resisted. On October 23, 2015, the court appointed Stoebe as the GAL for the children. The GAL conducted interviews, questioned the parties at trial, and compiled a posttrial report dated March 2, 2016. The GAL recognized "the long-established rule is to keep children together whenever possible" but concluded:

> I see nothing beneficial by forcing one child or the other to relocate. Both are thriving. The parents are commendably getting along well on issues of the children. I see only positives for the children into the future with current living [arrangement] solemnized by the [c]ourt. To uproot them now and reshuffle residence, visitation, friends, school, etc. may well generate more court activity of a very dark and damaging nature.

The district court's July 28, 2016 dissolution decree discussed the GAL's report as one of eleven factors it analyzed, stating the GAL provided "an excellent summary" of the relevant evidence and "has recommended" the court implement "a split physical care arrangement. Although the court will not abdicate to the [GAL] its duty to decide the custody issues in this case, the court is grateful for the work [of the GAL] and has accorded respectful consideration" to his report and recommendations. The court also provided a thoughtful analysis of the other ten factors—the characteristics of each child, the emotional, social, moral, material, and educational needs of each child, the characteristics of each parent, the capacity and interest of each parent to provide for the needs of the child, the interpersonal relationship between the child and each parent, the interpersonal relationship between the siblings, the effect on each child of

continuing or disrupting an existing custodial status, the stability and wholesomeness of each home environment, the child's preference, and the court's available alternatives. After considering all the factors and recognizing the preference against split care made its decision "a close one," the court ruled, "in this case, split physical care is in the best interests of each child."

Under the decree, the boys are together every Wednesday and every weekend, alternating between Clear Lake and the farm. Each parent has ten days of summer visitation each year with both boys. The district court recognized implementation of the schedule is "a little complicated," and it expected the parties to be "flexible and accommodating with each other and with their sons. The boys are at an age where their views are entitled to respectful consideration by their mother and father."

In his cross-appeal, Tim argues the family's circumstances are not "the unique situation in which split care should be awarded," quoting the applicable legal standard:

> There is a presumption that siblings should not be separated. We have long recognized that split physical care is generally opposed because it deprives children of the benefit of constant association with one another. "The rule is not ironclad, however, and circumstances may arise which demonstrate that separation may better promote the long-range interests of children." Good and compelling reasons must exist for a departure.

*In re Marriage of Will*, 489 N.W.2d 394, 398 (Iowa 1992) (citations omitted).

In the decree, the court found both Tim and Jodi "are good parents" who will cooperate "to see that the two boys are together as much as possible." The court believed Jodi, as compared to Tim, "might be a bit more attuned to the many non-verbal, intuitive queues of a child's unstated emotional needs." The

court also found "some truth" to the fact Tim worked hard and became more involved in the boys' lives following the separation. But the court observed Tim "seems able to overlook minor bumps in the road, trying to guide as much by example and inaction as forcible intervention." In sum, the court found "each parent presents positive aspects, and each possesses some positive aspects the other does not."

Noting a resolution of physical care "involves a great deal more than simply asking children with whom they wish to live," the court gave some weight to W.E.'s preference to live with his father on the farm and to D.E.'s preference to live with his mother in Clear Lake, but based on each child's age, it gave greater weight to W.E.'s preference. The court also noted fourth-grader D.E. was in generally good health but had stomach issues acknowledged by both parents and treated medically. The court found both Jodi and D.E.'s "physician link, to some extent, the custody difficulties, especially when [D.E. is with Tim], with some recurrence of [D.E.'s] stomach problems."

Discussing long-range issues, the court noted W.E. will finish high school in three years (now two years), while D.E. had another year of grade school followed by middle school in 2017-18. When considering the effect of continuing or disrupting the children's existing care, the district court believed trouble would ensue if the court placed W.E. with his mother in Clear Lake and would also ensue, "including probable emotional damage to D.E., should he be placed with [his father] and required to live on the farm." The court found, "any disposition

other than split physical care will cause significant emotional harm to at least one of the two children, which may take years to resolve, if ever."[2]

After framing its alternatives—placing both boys on the farm with Tim, placing both boys with Jodi in Clear Lake, or keeping split care—the court concluded: "[S]plit physical care is the least damaging alternative available in this case." Our court has defined "split physical care" as "the separation of children between parents." *In re Marriage of Fynaardt*, 545 N.W.2d 890, 893 (Iowa Ct. App. 1996). While courts endeavor to keep children together, the rule is not "ironclad." *In re Marriage of Jones*, 309 N.W.2d 457, 461 (Iowa 1981).

After observing Tim and Jodi over eight days of testimony, the district concluded it was in the children's best interests to be placed in split physical care. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (recognizing the district court's ability to observe the demeanor of the witnesses helps it formulate a "wise decision"). Relevant factors in addition to each parent's caretaking capability include the age difference between the separated children, the relationship between the children, and the likelihood that one of the parents or children would turn a child against the other parent. *Will*, 489 N.W.2d at 398. The decree shows the district court was fully aware of these principles. The decree implicitly concludes "both of the parties are capable caretakers as to the

---

[2] Earlier, the court had found each boy had a stronger interpersonal relationship with the parent with whom he had been living but "this phenomenon is more than just a result of their recent placement." Due to W.E.'s age and desire to emulate his father, W.E. has "a strong interest" in his friends at school and in Algona generally, sports, and living and working on the family farm. Finding D.E. to be "a harder study," the court observed: "[T]here was something about D.E. that has made him wish for some new surroundings. He wanted, and now appears to thrive in, the school system in Clear Lake, Iowa and living with his mother."

specific [child] placed in their care." *See id.* (recognizing needs of "children within the same family may differ").

On appeal, Tim contends the difference of four and one-half years in age and five grades between the brothers is not significant and the boys are bonded to each other. As an example of their bond, Tim asserts D.E. likes to help W.E. pick up rocks on the farm and they enjoy trap shooting together. Tim claims: "[B]oth children's relationships with their individual brother and with their parents [are] normal and neither party had great disdain for the other." But Tim emphasizes W.E. was "absolutely adamant" about not leaving his current school system or the farm. Tim argues split care was not working because the boys were not spending enough quality time together. Tim alleges the boys were tired from travelling back and forth and D.E. would fall asleep in the car. Tim concludes split care should not be ordered because neither brother has angst against the other or against a particular parent and because the GAL recognized the brothers have a bond and both missed each other after only a couple of months being apart.[3]

The issue before us is whether, despite the presumption in favor of keeping siblings together, under the conditions that have arisen in this family, "separation may better promote the long-range interests of the children." *See*

---

[3] Despite his own reliance on the GAL report for this conclusion, on appeal Tim contends the GAL's report used discredited gender stereotypes and the district court gave the report too much deference. Jodi responds Tim did not preserve error on his challenge to the GAL's report. We find no merit in Jodi's error-preservation challenge; the district court acknowledged Tim disagreed with the GAL and sought physical care of both boys in his posttrial briefing. On the other hand, we are not persuaded by Tim's attack on the GAL report. The district court weighed the GAL report as only one of the eleven factors it thoughtfully considered in its physical-care analysis. Further, when the report is read as a whole, the GAL's conclusion is not premised on improper grounds.

*Jones*, 309 N.W.2d at 461 (citing *In re Marriage of Wahl*, 246 N.W.2d 268, 270 (Iowa 1976)). Upon our de novo review, we find "good and compelling reasons" for split physical care in the circumstances of this case. While each boy loves both parents and his brother, the boys are five grades apart, their social lives and activities are obviously unalike, and as recognized by the district court, their age difference "means that they are not going to be in constant association with each other. Their interests are necessarily going to diverge."

Jodi and Tim love and support their children and each is a capable caretaker. To their credit, neither Jodi nor Tim has taken steps to damage the other's relationship with the children.[4] But we find it significant that Jodi was the historical caretaker for the boys, and her more flexible work schedule, especially in June and July when D.E. is not in school, allows her to "better minister" to D.E.'s needs as a younger child. *See Will*, 489 N.W.2d at 396-99 (affirming district court's split physical care).

Split care is also supported by the stability the arrangement provides. W.E. recently finished his sophomore year; he strongly desired to live on the farm with Tim, is helpful on the farm, and is happy at Garrigan high school where he can participate in activities with his long-time friends. In contrast, while D.E. enjoys his time on the farm with his brother and father, he wants to live with his mother and is thriving in his new school in Clear Lake, recently completing fifth

---

[4] After Jodi and Tim separated, there were relatively few unpleasant incidents between them affecting the children. The record shows those incidents were typical of incidents occurring in the heightened emotions of dissolution proceedings. Such matters do not affect either party's ability to capably parent the children or either party's ability to support the children's relationship with the other spouse.

grade. The record supports the district court's conclusion that moving D.E. into Tim's care would likely have negative consequences for D.E.

Recognizing the district court's advantage of being able to watch and listen to the parties and the other witnesses during this extended trial, we agree with its observation "each boy has, to some extent, perhaps instinctively, gravitated to the parent with whom he feels most comfortable, from whom he will accept guidance best, and the parent [that] will ultimately guide him to a full measure of well-adjusted adulthood." Because split physical care promotes each child's long-term best interests, we affirm.

## IV. Calculation of Tim's Child Support Obligation

In the event split care is affirmed, Tim asks for a remand for the district court to recalculate his child support. The parties agree Jodi's wages are $3458.10 per month, or $41,497.20 per year. The court found a six-year average of Tim's 2009 to 2014 annual income to be $149,800. For 2015, the court found Tim's "actual cash loss" would be "much less than his tax loss," disallowing Tim's deductions for attorney fees and depreciation on farm equipment Tim "secured from his father's estate." Taking these factors into consideration, the court concluded a gross annual income of $125,000 "is a reasonable sum to attribute to [Tim] for the purpose of calculating child and spousal support." Tim does not challenge this determination on appeal.[5] The court ordered Tim to pay Jodi $742 in monthly child support while both boys are minors, with support increasing to $1149 per month when D.E. is the only dependent.

---

[5] The district court also found, if Tim decided to cash rent his farm ground at "$275 per acre," he could receive "$148,500 in gross annual income before real estate taxes."

On appeal, Tim asserts the district court mistakenly used $150,000 for Tim's income in its guideline calculations. We agree that amount was inconsistent with the court's earlier declaration that $125,000 per year was a reasonable sum to assign as Tim's income for determining child support. Because the court made a scrivener's error,[6] we remand for the recalculation of Tim's child support using $125,000 as his gross annual income.

## V.     Alimony

At trial, Jodi requested reimbursement alimony to offset Tim's purchase of farm land titled in his name during their marriage. Citing Iowa case law dealing with marriages of shorter duration where one spouse makes career sacrifices while the other obtains a professional license, the district court ruled the facts here did not support reimbursement alimony. The court reasoned: "In this case it appears that efforts during the marriage by [Jodi] benefited [Tim]. In a case without a prenuptial agreement, this economic benefit conferred by [Jodi] would be reflected in a property settlement." Instead, the district court ordered Tim to pay traditional alimony of $1166 per month, terminating upon death or Jodi's remarriage.

Alimony is not an absolute right; an award depends upon the specific circumstances of each case. *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015). On appeal, Jodi challenges the alimony award in two alternative ways.

Jodi first seeks $600,000 in reimbursement alimony, asserting the court "misinterpreted the law" after it recognized Tim benefited from Jodi's efforts

---

[6] A "scrivener's error" results from inadvertence and not from judicial reasoning. *See Scrivener's Error*, Black's Law Dictionary (9th ed. 2009)

during the marriage as her efforts freed up marital cash for Tim to accumulate farmland. Jodi admits the "typical factual circumstance" for reimbursement alimony is a spouse's contributing toward the other spouse's "advanced professional degree" but creatively argues reimbursement alimony "should not be limited to only those situations involving professional degrees," otherwise, a farmer's divorce rights are elevated "over those of persons with professional degrees."

Tim points to the long duration of the marriage—eighteen years—and the fact the circumstances are not similar to "degree cases" where there is "little or no property to be divided." Jodi was awarded $810,000 in assets with no debt. Tim contends Iowa law does not extend reimbursement alimony "beyond situations where the marriage is devoted almost entirely to the educational advancement of one spouse." He asserts the rationale for reimbursement alimony "is not the efforts of the supporting spouse, but the fact there has not been enough time for the parties to receive the benefit from the [educational] advancement through tangible assets accumulated during the marriage."

After reviewing Iowa case law, we find Tim's argument persuasive and conclude Jodi is not entitled to reimbursement alimony under these circumstances. *See Probasco*, 676 N.W.2d at 184 ("Reimbursement alimony was first denominated as such in *Francis*."); *In re Marriage of Francis*, 442 N.W.2d 59, 61 (Iowa 1989) (resolving "'advanced degree/divorce decree' dissolution of marriage action" (citation omitted)). Jodi cites no case from *any* jurisdiction applying a "degree analysis" to the acquisition of farmland during a long-term marriage. As the district court explained, but for the prenuptial

agreement, the economic benefit Jodi conferred on Tim would have been reflected in a property division in this marriage of long duration. *See Francis*, 442 N.W.2d at 66.

Our analysis starts with *Francis*, which ventured "no predictable method of valuing" a wife's contribution to her husband's "increased earning capacity due to his education received during the marriage" had been settled upon in Iowa. 442 N.W.2d at 61-61 (stating prior cases "interchangeably used property awards and alimony" to compensate the non-student spouse). Seeking to provide predictability, *Francis* approved the Utah Court of Appeals analysis recognizing traditional alimony "would often work hardship" when a divorce "occurs shortly after the degree is obtained" due to both spouses having modest incomes but "one is on the threshold of a significant increase in earnings. Moreover, the spouse who sacrificed . . . is precluded from enjoying the anticipated dividends the degree will ordinarily provide." *Id.* at 63 (quoting *Petersen v. Petersen*, 737 P.2d 237, 242 n.4 (Utah Ct. App. 1987)). Following these principles, *Francis* affirmed an award of reimbursement alimony to the non-student spouse, providing the following rationale:

> A calculation of future earning capacity . . . essentially represents a value placed on *the income to be derived from the advanced degree achieved during the marriage* . . . . Thus, the court's duty to look at the future earning capacity of the spouses tracks more closely with a concern for loss of anticipated support, reimbursable through alimony, *than through division of as-yet-unrealized tangible assets.*

442 N.W.2d at 63 (emphasis added).

In 2004, the Iowa Supreme Court followed *Francis* and rejected a wife's request for reimbursement alimony. *See Probasco*, 676 N.W.2d at 186. Similar

to the matter before us, the parties in *Probasco* had a long-term marriage and the wife had not contributed to the husband's college degree. *Id.* After the wife supported the husband in starting and running several successful restaurant franchises, the parties accumulated tangible assets. *Id.* *Probasco* explained *Francis* had described "*the circumstances under which reimbursement alimony should be awarded*" as follows—"for marriages of short duration . . . devoted almost entirely to the educational advancement of one spouse and yield[ing] the accumulation of few tangible assets." *Id.* at 185 (emphasis added) (quoting *Francis*, 442 N.W.2d at 62); *see also In re Marriage of Hayes*, No. 11-1847, 2012 WL 2407540, at *2 (Iowa Ct. App. June 27, 2012) (affirming reimbursement alimony where dissolution occurred five years after increase in doctor's medical income).

*Probasco* found the following circumstances "militate against an award of reimbursement alimony" to the wife: (1) the "marriage was *not one of short duration* devoted almost entirely to the educational advancement of one spouse"; (2) although the wife "may not have pursued her career during the marriage as much as she may have liked," she was actively involved in the job market during the marriage with career skills that are not outdated; and (3) the parties' "significant assets" will balance the equities without the need for an award of reimbursement alimony as the wife "leaves the marriage with a net worth in excess of $800,000." 676 N.W.2d at 186 (emphasis added).

Unlike *Francis*, Iowa's seminal case on reimbursement alimony, Jodi and Tim have accumulated millions of dollars in tangible assets, and Jodi did not contribute to an advanced degree for Tim with her contribution followed shortly

thereafter by a divorce. Under *Frances* and *Probasco*, we decline Jodi's request for reimbursement alimony.

Jodi alternatively requests "a significant increase in lifetime traditional alimony," claiming equity requires an increase from $1166 per month to $2200 each month "until death." Tim disagrees.

As an initial matter, the district court ended Tim's alimony obligation upon either party's death *or Jodi's remarriage*; we find this provision equitable as written. *See Gust*, 858 N.W.2d at 415 (stating "traditional spousal support is ordinarily unlimited in duration except upon the remarriage of the payee spouse, or death of either party"). Second, traditional alimony is intended to provide Jodi "with support comparable" to what she would have received if her marriage to Tim had continued. *See In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). Alimony may not be restricted by a premarital agreement. *In re Marriage of Shanks*, 758 N.W.2d 506, 513 (Iowa 2008); *see also* Iowa Code § 596.5(2) (2015). The amount of Jodi's alimony is to be "calculated equitably" based on *all* statutory factors, *Schenkelberg*, 824 N.W.2d at 486; such factors are not "considered in isolation from each other," *Gust*, 858 N.W.2d at 408.

The relevant factors are set out in Iowa Code section 598.21A, and we "consider property division and alimony together in evaluating their individual sufficiency." *In re Marriage of Christensen*, 543 N.W.2d 915, 919 (Iowa Ct. App. 1995). We also consider the terms of any premarital agreement. *Id.* (considering, unlike here, spouse seeking support received an "enhanced property distribution" from her premarital agreement, diminishing "her need" for alimony). Our supreme court has discussed the interrelationship of a property

award under a premarital agreement and a request for alimony, explaining (1) the husband "received a substantial property award" due to the premarital agreement, (2) a proper spousal-support calculation for the wife looks "at the assets each party received" in order to "determine the income potential of the property distributed to each party," and (3) the husband's assets will continue "to generate substantial income" and the assets the wife was awarded will not. *Schenkelberg*, 824 N.W.2d at 487.

The following facts are key to our analysis. At the time of the dissolution trial, Jodi was forty-six and Tim was fifty-one years old. Both parties are generally in good health.[7] Their marriage was of relatively long duration. Jodi received $810,000 in net marital property. Under the premarital agreement, Tim received more than three times as much net marital property, around $3,582,000.[8] As in *Schenkelberg*, the marital assets Tim received will continue to generate substantially more income than the marital assets Jodi received.[9] 824 N.W.2d at 487. Additionally, the earning patterns of the parties are set, and their earning capacity is another factor we consider in setting the amount of spousal support. *See id.* Jodi continues in her long-term ISEA employment, earning around $41,500 annually. Jodi's child-care responsibilities during the marriage reduced both her earned-income track at her employer and her savings. Another factor reduced Jodi's savings—as noted by the district court—

---

[7] Jodi has recovered from her heart attack.

[8] Specifically, Tim asserts: "Removing the gifted and inherited property ($3,538,321) from Tim's side of the equity and accounting for his $944,454 in liabilities, Tim actually received $3,581,499 in marital assets."

[9] Jodi received $262,500 for her share of the Thill farm. The current rate of return for a one-year CD (FDIC insured) is 1.5%. Applying that percent shows Jodi can earn $3938 each year in a conservative investment.

the parties agreed to use Jodi's income for nondeductible living expenses allowing Tim to "free up cash flow generated by [his] farming operation to be invested or re-invested in assets titled solely in his name."

As to Tim's earning capacity, he continues farming, earning an average annual income of $125,000—three times the amount Jodi will earn each year. Further, Jodi will not have the ability to rival Tim's earning capacity as she continues to provide physical care for D.E. We also agree with the district court's belief that many of Tim's personal expenses "would be paid untaxed by his farming operation." As in *Scheckelberg*, Tim has "the ability to pay a substantial amount of support indefinitely into the future." *Id.* Considering all relevant factors, we conclude it is unlikely Jodi will be able to support herself, care for D.E., take vacations similar to the ones the parties enjoyed during their marriage, and fund an increase to her savings without spousal support from Tim of $1666 per month. We modify the decree accordingly.[10]

## VI. Trial and Appellate Attorney Fees

The prenuptial agreement states the parties "shall have no rights" to attorney fees and expenses upon the filing of a petition for dissolution and the court granting a dissolution. The district court asked the parties to brief whether a prenuptial agreement's prohibition of an award of attorney fees violated public policy. *See* Iowa Code § 596.5(1)(g) (permitting parties to a premarital agreement to contract with respect to "any other matter, including the personal

---

[10] Jodi's final alternative argument asserts, if she is not awarded "significant reimbursement alimony or increased traditional alimony," we should increase her property award. Because we have increased Jodi's traditional alimony, we do not address this claim.

rights and obligations of the parties, not in violation of public policy"). When the parties failed to produce "any case on point in Iowa or elsewhere," the court rejected Jodi's request for trial attorney fees, reasoning it did "not have authority to ignore the plain language of the parties' prenuptial agreement." The court ordered Tim to pay court costs, including the $9140 GAL fee.[11]

On appeal, Jodi claims the parties' premarital agreement waiving attorney fees in the event of dissolution is "void as against public policy." She contends it would "violate public policy to leave a spouse without means to litigate the best interests of her children."[12]

Generally, Iowa courts have considerable discretion in awarding attorney fees in dissolution cases. *In re Marriage of Steele*, 502 N.W.2d 18, 22 (Iowa Ct. App. 1993). Jodi bases her argument for attorney fees on the public-policy limitation in Iowa Code section 596.5(1)(g), as well as section 596.5(2), which commands that the right of a child to support "shall not be adversely affected by a premarital agreement." Jodi contends, because Iowa prohibits premarital agreements "from regulating child custody and child support, it follows that

---

[11] In the temporary proceedings, Jodi requested fees so she could employ experts to appraise Tim's real estate and farm machinery. The court ordered Tim to pay Jodi $20,000, reserving its final resolution of Tim's advance for the decree. Jodi then paid the retainers and hired the valuation experts. In the decree, the court did not grant Tim's request Jodi repay this advance. Tim challenges that ruling on cross-appeal. In declining to order repayment, the district court reasoned Jodi's experts' appraisals "ultimately became the figures agreed to by the parties' in their pretrial stipulation." The award of litigation expenses is traditionally within the district court's discretion. *EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 301 (Iowa 2000). Jodi's use of experts was related to the extensive nature and complexity of Tim's assets and led to a successful stipulation of values by the parties. Finding the district court's decision equitable and logical, we are unable to find the court abused its discretion.

[12] Jodi also claims it would violate public policy to disallow attorney fees incurred to litigate the validity of the premarital agreement and the provisions of spousal support. Because she provides no compelling arguments to reach these litigation categories, we limit our analysis to attorney fees concerning child-related issues.

awarding attorney fees to seek child custody and child support cannot be prohibited."

In asking for briefing on the interplay of these two sections, the district court opined "it did not seem fair that a party with vastly superior financial resources could," based on a prenuptial agreement, "possess a great deal of money with which to fund litigation over such an important issue as child custody." The court explained that it "always viewed an award of counsel fees as a way to allow each party to a marriage to make a fair fight of it at trial." Although the parties did not provide cases to the district court, both now cite relevant cases on appeal. Both also acknowledge the Iowa Supreme Court has not addressed the propriety of waiving attorney fees in a premarital agreement, making it an issue of first impression in this state.

In support of her claim the premarital waiver of attorney fees violates public policy, Jodi cites *Walker v. Walker*, 765 N.W.2d 747, 755 (S.D. 2009), in which the husband argued the wife "unreasonably elevated the cost of litigation." Jodi similarly claims her evidence took two days and Tim increased her litigation expenses by calling witnesses for six days. *Walker* held because public policy precluded waiver of alimony in a prenuptial agreement, by "logical extension" attorney fees associated with an alimony award also could not be prohibited by the prenuptial agreement. 765 N.W.2d at 755. Jodi argues a similar "logical extension" applies to attorney fees for litigating child custody and child support.

Citing Iowa Code section 596.5, Tim counters that "[a]lthough the legislature had the opportunity to prohibit clauses in a premarital agreement that restrict payment of attorney fees when child custody is at issue, the legislature

did not do so."[13] But Tim acknowledges other state courts have found premarital agreements prohibiting attorney fees as to child-related issues are not enforceable. For example, in *In re Marriage of Best*, an Illinois appellate court analyzed a premarital agreement that "would bar fee-shifting for costs incurred in connection with child support." 901 N.E.2d 967, 970 (Ill. App. Ct. 2009). Similar to Iowa Code section 596.5(2), the pertinent Illinois provision stated: "The right of a child to support may not be adversely affected by a premarital agreement." *Id.* at 971 (citation omitted). The "pivotal question" before the Illinois court was "whether a fee-shifting ban governing child-related issues violates" public policy. *Id. Best* answered the question in the affirmative, holding "the fee-shifting ban" in the parties' premarital agreement was "not enforceable as to child-related issues because it violates public policy by discouraging both parents from pursuing litigation in their child's best interests." *Id.* at 970.

*Best* cited approvingly to *In re Marriage of Ikeler*, 161 P.3d 663, 667 (Colo. 2007), where the state supreme court pointed out the Colorado Marital Agreement Act (CMMA) did not specifically mention attorney fees; therefore, the "only statutory basis for parties to contractually waive an award of attorney's fees" is the catch-all provision allowing contracts "not in violation of public policy." *Ikeler* reasoned, "[u]nder this subsection, if a waiver of attorney's fees violates public policy it cannot be enforced by the court because it is not a valid contract term." 161 P.3d at 667. *Ikeler* concluded:

---

[13] Tim also cites the South Carolina Supreme Court's holding: "[P]renuptial agreements waiving alimony, support, and attorney's fees are not per se unconscionable, nor are they contrary to the public policy of this state." *Hardee v. Hardee*, 585 S.E.2d 501, 504 (S.C. 2003). Because *Hardee* does not address attorney fees for child-related issues, it is not persuasive to our analysis.

[A] waiver of attorney's fees violates public policy where one spouse lacks the financial resources to litigate the dissolution, and the case involves issues of parental responsibilities and child support. The CMAA specifically states that "[a] marital agreement may not adversely affect the right of a child to child support," which reflects the well-established policy of this state that the needs of the children in a dissolution proceeding are paramount. If one spouse is unable to hire an attorney, and the parties waived a possible award of attorney's fees in a marital agreement, the lesser-earning spouse's ability to effectively litigate the issues related to the children will be substantially impaired. This, in turn, may negatively impact the court's ability to assess the best interests of the children.

*Id.* at 670-71 (citations omitted); *see also In re Marriage of Joseph*, 266 Cal. Rptr. 548, 552-53 (Cal. Ct. App. 1990) (reasoning a parent litigating a custody dispute is also representing the child's interests and the parties' fee-shifting bar "abridge[s] the courts' ability to act on behalf of the children").

Finally, the Washington Court of Appeals rejected a husband's argument that while parents cannot enter into binding contracts regarding parenting plan issues, the parties can waive a right to an award of attorney fees and costs, "which is not a parenting plan issue." *In re Marriage of Burke*, 980 P.2d 265, 268 (Wash. Ct. App. 1999). Noting the "state's interest in the welfare of children requires" a court "have the discretion to make an award of attorney fees and costs so that a parent is not deprived of his or her day in court by reason of financial disadvantage," the court ruled the parties' attorney-fee bar in their prenuptial agreement violated public policy as to litigation of parenting-plan issues. *Id.*

In Iowa, the purpose of child support is "to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective incomes." Iowa Ct. R. 9.3.

Similarly, the controlling consideration in determining physical care is the children's best interests. *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010). As set out above, Iowa statues prohibit parties to a premarital agreement from contracting in violation of public policy and from contracting "adversely" to the right of children to support. Given these expressions of Iowa's public policy, we find persuasive the analyses in *Best*, *Ikeler*, *Joseph*, and *Burke*. Iowa's commitment to the best interests of the children of divorce requires our courts "have the discretion to make an award of attorney fees and costs" as to child-related issues in dissolution proceedings so that "a parent is not deprived of his or her day in court by reason of financial disadvantage." *Burke*, 980 P.2d at 268. Accordingly, the provision in the Erpeldings' premarital agreement waiving such fees and costs is void and unenforceable as to child-related issues because it violates Iowa "public policy by discouraging both parents from pursuing litigation in their child's best interests."[14] *Best*, 901 N.E.2d at 970.

We reverse and remand to the district court with instructions to exercise its discretion to make an award of attorney fees and costs to Jodi as to child-related issues litigated in the dissolution matter. Next, we grant Jodi's request for attorney fees on appeal as to the child-related issues. *See McKee*, 785 N.W.2d at 740 (setting out standard). The amount of Jodi's award, both at trial and on appeal, shall be determined by the district court upon remand.

---

[14] Tim alternatively asserts, if we conclude "a premarital agreement prohibition on attorney fees" as to child-related issues violates public policy, we should find the agreement's restrictions here voidable as applied and not void *per se*. Tim then asserts public policy concerns that Jodi would not be able to effectively litigate the children's best interests are not present because the children's interests were "fully represented" by the GAL and Tim paid the GAL's fee. We are not persuaded. Tim cites no cases supporting his proposition a GAL's role supplants a parent's role in dissolution proceedings involving custody and child support.

Costs on appeal are assessed to Tim.

**AFFIRMED AS MODIFIED AND REMANDED.**



IOWA APPELLATE COURTS

State of Iowa Courts

**Case Number**        **Case Title**
16-1419                In re Marriage of Erpelding

Electronically signed on 2017-06-21 08:38:55